[No. E006138. Fourth Dist., Div. Two. Feb. 2, 1990.]

JAMES SEMORE et al., Plaintiffs and Appellants, v.
ERIC POOL et al., Defendants and Respondents.

COUNSEL

L. M. Schulner and Timothy S. Camarena for Plaintiffs and Appellants.

Paul, Hastings, Janofsky & Walker, Robert F. Walker and Joseph L. Beachboard for Defendants and Respondents.

OPINION

**HOLLENHORST, Acting P. J.**—In this case, we find that the right of privacy in the California Constitution protects Californians from actions of private employers as well as government agencies.

Accordingly, when a private employee is terminated for refusing to take a random drug test, he may invoke the public policy exception to the at-will termination doctrine to assert a violation of his constitutional right of privacy.

We therefore find that the trial court erred in granting a demurrer without leave to amend to causes of action for wrongful termination in violation of public policy and for breach of an implied-in-fact promise to discharge for good cause only.

■ ■ ■ ■ THE COMPLAINT[1]

The first amended complaint alleges that plaintiff James Semore was employed by defendant Kerr-McGee Chemical Corporation on May 26, 1977, at its chemical plant in Trona, California.[2] He was terminated on September 13, 1986, because he refused to consent to a pupillary reaction eye test. The purpose of the test was to determine if plaintiff was under the influence of drugs. All employees were given the test and, upon plaintiff's refusal to take the test, he was terminated for insubordination.

Ten causes of action are alleged, including wrongful termination and breach of express and implied contractual provisions. Fraud and misrepresentation causes of action are based upon statements in an employee handbook. Intentional and negligent emotional distress and loss of consortium allegations are also included.

Plaintiff's wrongful termination allegations are based on his contention that his right of privacy under the California Constitution prohibits his employer from conducting arbitrary drug testing and that his termination therefore violated the public policy of the state.

---

[1] We apply the well-established rules that: "The allegations of the complaint must be regarded as true. . . . All that is necessary as against a general demurrer is to plead facts showing that the plaintiff may be entitled to some relief. In passing upon the sufficiency of a pleading, its allegations must be liberally construed with a view to substantial justice between the parties." (*Fundin* v. *Chicago Pneumatic Tool Co.* (1984) 152 Cal.App.3d 951, 955 [199 Cal.Rptr. 789].)

[2] The individual defendants are employee relations specialists for Kerr-McGee who ordered plaintiff to take the subject drug test and who terminated him when he refused.

## THE DEMURRER

The demurrer alleged that, as a matter of law, an employee has no constitutionally protected right to refuse to undergo a nonintrusive and simple eye reaction test requested by his employer. The demurrer alleges that all of the causes of action rest on this issue and, as a result, the entire complaint should be dismissed.

## THE TRIAL COURT'S RULING

The trial court agreed with defendants and made findings "that defendants had a compelling interest that their employees be free of the influence of drugs at the time of their actual working hours. The court further finds that a pupillary eye test is a nonintrusive preliminary test that indicates the possible influence of drugs. The court further finds that plaintiffs should have had an expectation of such reasonable examination to determine their fitness for work." The court then sustained the demurrer to all causes of action without leave to amend. This appeal followed.[3]

## ISSUES PRESENTED

Defendants contend that the trial court's ruling was "perfectly" decided. First, they contend that the right of privacy is only a protection against governmental intrusion and their demurrer was properly sustained in the absence of any allegations of state action. Second, they contend that plaintiff cannot state a cause of action because the public policy exception to the at-will doctrine does not apply. Third, they contend that no privacy right is invaded but that, even if a privacy right is involved, the employer's need to assure safe and efficient operation of its plant outweighs the employee's legitimate expectations of privacy. Fourth, they contend that all causes of action are barred or, if not barred, are individually defective.

We consider each of these contentions in turn.

## THE CONSTITUTIONAL RIGHT TO PRIVACY APPLIES TO PRIVATE EMPLOYERS

■ Article I, section 1, of the California Constitution provides that privacy is one of our inalienable rights. Since privacy can be invaded by government agencies, businesses, or individuals, the courts and commenta-

---

[3] Plaintiffs filed a premature notice of appeal after receiving a notice of entry of ruling. We treat the notice as being from the subsequent judgment of dismissal. (Cal. Rules of Court, rule 2(c).)

tors agree that the constitutional provision provides at least some protection against nongovernmental action. (*Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825 [134 Cal.Rptr. 839]; *White* v. *Davis* (1975) 13 Cal.3d 757, 773-776 [120 Cal.Rptr. 94, 533 P.2d 222].)

We do not need to review the authorities in detail because the recent case of *Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034 [264 Cal.Rptr. 194], has done the job for us. In that case, the First District reviewed the question of whether a preemployment urinalysis requirement violated an applicant's privacy rights. Among other issues, the court considered whether the constitutional provision applies to private employers, and found that it does. We agree with the case analysis in that opinion, which concludes: "the courts were unanimous in holding that the state constitutional privacy provision provides some protection against nongovernmental intrusion. Defendants cite no case in which a court has held to the contrary." (*Id.*, at p. 1043.)

Defendants rely on *Schmidt* v. *Superior Court* (1989) 48 Cal.3d 370 [256 Cal.Rptr. 750, 769 P.2d 932], which they contend "either effectively holds that the privacy right protects only against governmental intrusion ... or at a minimum holds that the state action issue is open for resolution." In *Schmidt,* our Supreme Court considered the validity of a rule adopted by the owner of a private mobilehome park. The rule limited residence in the park to persons 25 years of age or older. The court held that the California statutes permit such a rule, and the statutes and the rule are constitutional. (*Id.*, at p. 373.) Among other arguments, plaintiff claimed the rule was invalid because it interfered with their right of familial privacy. The court pointed out that the rule was not state imposed, but rather that the statute specifically left the decision to the owner of the mobilehome park. (*Id.*, at p. 388.) The court then stated that the constitutional challenge would fail even if state action was involved. In a footnote, the court said: "[W]e have no occasion in this case to consider under what circumstances, if any, purely private action by a property owner or landlord would constitute a violation of the state constitutional privacy provision." (*Id.*, at p. 389, fn. 14.) Defendants rely on this footnote to contend that the decision is dispositive of this appeal and that it is an "effective holding" that private conduct is not within the statute. We disagree. The footnote clearly states that the issue is not being decided, and remains an open question in our Supreme Court.

While the concept of privacy covers a broad range of human activity, we have no doubt that at least some types of nongovernmental conduct can interfere with the right granted by the constitutional provision. We therefore reject defendants' contention that an allegation of state action was required to overcome the demurrer.

## PLAINTIFF CAN POSSIBLY ALLEGE A CAUSE OF ACTION

Defendants next contend that plaintiff cannot allege a cause of action for wrongful termination because the public policy exception to the at-will doctrine does not apply.

Labor Code section 2922 provides that an employment relationship of an unspecified duration may be terminated at the will of either party. This section establishes a presumption of at-will employment that may be overcome by evidence of express or implied contractual limitations on the right of discharge or limitations imposed by public policy. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 665 [254 Cal.Rptr. 211, 765 P.2d 373]; *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917]; Wrongful Employment Termination Practice (Cont.Ed.Bar 1987) §§ 2.32-2.39, pp. 39-48.) Although plaintiff alleges contract causes of action, discussed below, his first cause of action for wrongful termination attempts to plead this public policy exception to the employer's right to terminate an at-will employee. The allegations assume that he was such an employee.

"[T]he employer's right to discharge an 'at will' employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal." (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 665.)

In *Petermann* v. *International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184 [344 P.2d 25], an at-will employee was discharged for his refusal to commit perjury. The court said: "It would be obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge any employee, whether the employment be for a designated or unspecified duration, on the ground that the employee declined to commit perjury, an act specifically enjoined by statute." (*Id.*, at pp. 188-189.) These public policy considerations prevented the employer from discharging the employee for his refusal to commit perjury.

*Foley* also cites with approval *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]. In that case, plaintiff alleged that he was discharged for refusing to engage in price-fixing in violation of the antitrust laws. The court held that he could maintain a tort action for wrongful discharge when he was discharged for refusing to engage in illegal conduct. "[A]n employer's obligation to refrain from discharging an employee who refuses to commit a criminal act . . . reflects a duty imposed by law upon all employers in order to implement the

fundamental public policies embodied in the state's penal statutes." (*Id.*, at p. 176.)

*Foley* approved the tort cause of action based on a discharge in violation of public policy but held that the plaintiff there did not allege facts showing a violation of a fundamental public policy. Plaintiff there alleged only that he was discharged in violation of "a substantial public policy that imposes a legal duty on employees to report relevant business information to management." (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 669.) The court held that the allegation of violation of a statute was not enough because the violation alleged must implicate fundamental public policy concerns. "Even where, as here, a statutory touchstone has been asserted, we must still inquire whether the discharge is against public policy and affects a duty which inures to the benefit of the public at large rather than to a particular employer or employee." (*Ibid.*) The court then found no substantial public policy interest involved in requiring an employee to report information relevant to his employer's interests, even if a statute required him to do so. (*Id.*, at p. 670.) The performance of the duty there served only the interest of the employer, not a public interest.

The same cannot be said of the privacy interest asserted here. The constitutional provision protects against unjustified intrusions on personal privacy. " 'The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. . . .' " (*Wilkinson* v. *Times Mirror Corp., supra,* 215 Cal.App.3d at p. 1040, quoting ballot argument in favor of Prop. 11; *White* v. *Davis, supra,* 13 Cal.3d 757; 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 454 et seq., p. 640 et seq.)

 While an employee sacrifices some privacy rights when he enters the workplace, the employee's privacy expectations must be balanced against the employer's interests. While the balancing in this case is discussed below, the point here is that privacy, like the other inalienable rights listed first in our Constitution, is at least as fundamental as the antitrust statutes in *Tameny* or the perjury statutes in *Petermann.* The right of privacy is unquestionably a fundamental interest of our society. (*Rulon-Miller* v. *International Business Machines Corp.* (1984) 162 Cal.App.3d 241, 255 [208 Cal.Rptr. 524], quoting *City and County of San Francisco* v. *Superior Court* (1981) 125 Cal.App.3d 879, 882 [178 Cal.Rptr. 435].)

We dwell on this point only because the dissent argues that plaintiff's right not to participate in the pupillary reaction test benefits him alone.

We think, however, that there is a public policy concern in an individual's right to privacy. Plaintiff's right not to participate in the drug test is a right he shares with all other employees. In asserting the right, he gives it life. While rights are won and lost by the individual actions of people, the assertion of the right establishes it and benefits all Californians in the same way that an assertion of a free speech right benefits all of us.

The dissent also argues that a contract provision obligating him to participate in such a test would not be invalid. This argument derives from *Foley's* statement that the presence or absence of a public interest can be tested by considering whether a contract requiring such conduct would be enforceable. (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at p. 670, fn. 12.)

While plaintiff could contractually agree not to assert his right to privacy, we think it clear that the employer could not use such an agreement to circumvent the public policy favoring privacy, and the employer could not successfully enforce such a contractual agreement if it intruded on plaintiff's right to privacy.[4] (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at p. 670, fn. 12.) If the intrusion violates the right to privacy, it is illegal whether or not it is pursuant to an agreement. If pursuant to such an agreement, the agreement would be unenforceable because it would be against public policy. In the words of *Foley*, the public policy here "affects a duty [here, the duty not to intrude on the right of privacy] which inures to the benefit of the public at large rather than to a particular employer or employee." (*Id.*, at p. 669.)

Simply put, the dispute here is more than a dispute between Mr. Semore and Kerr-McGee. It is a dispute over the role of drug testing in the workplace. The resolution of the dispute depends upon balancing an employee's expectations of privacy against the employer's needs to regulate the conduct of its employees at work. The allegation that plaintiff's right of privacy has been violated is the assertion of a public policy which is sufficiently important to overcome a demurrer. (*Payton* v. *City of Santa Clara* (1982) 132 Cal.App.3d 152 [183 Cal.Rptr. 17].) The case can then proceed to develop the facts needed to apply the balancing test. These facts include the amount of intrusion on the employee's privacy and the importance of safety and other considerations to the employer.[5]

---

[4]To clarify the example, assume the employer and the employee agreed that the employer could visit the employee's home at midnight each night to search for drugs, and the employer sued to enforce this contractual right. We think the court would find that the provision allowing midnight visits was invalid and against public policy because it violates the employee's expectation of privacy and is unrelated to the employee's job. The random drug-testing program here *could* also violate the employee's privacy rights. The allegation is at least sufficient to overcome the demurrer. (Wrongful Employment Termination Practice, *supra*, § 2.53, p. 59.)

[5]"Combatting drug abuse in the workplace is a noble goal. However, the California Constitution requires that any invasion of privacy by government or business entities be *necessary*

 At this point, we only find that the assertion of the constitutional right to privacy is the assertion of a fundamental principle of public policy which is sufficient to state a cause of action for wrongful termination. (*Rulon-Miller* v. *International Business Machines Corp., supra,* 162 Cal.App.3d 241.) "An employer engaging in such conduct violates a basic duty imposed by law upon all employers, and thus an employee who has suffered damages as a result of such discharge may maintain a tort action for wrongful discharge against the employer. [¶] Accordingly, we conclude that the trial court erred in sustaining the demurrer to plaintiff's tort action for wrongful discharge." (*Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d at pp. 178-179; *Dabbs* v. *Cardiopulmonary Management Services* (1987) 188 Cal.App.3d 1437 [234 Cal.Rptr. 129].)

Since plaintiff here has alleged facts that overcome the presumption of Labor Code section 2922, the demurrer on this cause of action should have been overruled or granted with leave to amend so that plaintiff would have the opportunity to eliminate extraneous matter, as discussed below. In either case, the employer will now have the opportunity to justify the action it took.[6]

## THE EMPLOYER'S NEEDS CANNOT BE ASSESSED ON DEMURRER

 Defendants next contend that no privacy right is invaded here but that, even if a privacy right is involved, the employer's need to assure safe and efficient operation of its plant outweighs the employee's legitimate expectation of privacy.

First, defendants urge us to find, as did the trial court, that a pupillary reaction eye examination is not intrusive. According to defendants, the test consists of shining a light into the eye and watching the reaction. Defendants urge that such a test cannot implicate any privacy concerns because it "merely gauges the reaction of an employee's pupils to light."

---

to achieve a *compelling* interest. Dealing with employee drug use by requiring all employees—innocent as well as guilty, suspected as well as not suspected, janitors as well as nuclear power plant employees—to submit to drug urinalysis sweeps too broadly." (Hunter, *Your Urine or Your Job: Is Private Employee Drug Urinalysis Constitutional in California?* (1986) 19 Loyola L.A. L.Rev. 1451, 1492, italics in original.)

[6] As the *Wilkinson* court points out, safety and other considerations may justify intrusive drug testing of categories of employees under a Fourth Amendment analysis. (*Wilkinson* v. *Times Mirror Corp., supra,* 215 Cal.App.3d at pp. 1044-1045, citing *Skinner* v. *Railway Labor Executives Ass'n* (1989) 489 U.S. 602 [103 L.Ed.2d 639, 109 S.Ct. 1402] and *National Treasury Employees Union* v. *Von Raab* (1989) 489 U.S. 656 [103 L.Ed.2d 685, 109 S.Ct. 1384].) It is certainly likely that similar safety concerns would justify drug testing of certain categories of employees in Kerr-McGee's chemical plant. Nevertheless, plaintiff does not allege the nature of his job in his complaint, and this is only one factor to be weighed in the balancing test discussed in the next section.

Defendants earnestly argue that observing the eyes of an employee is nonintrusive because it is lawful "sensory surveillance." However, the Supreme Court has recently granted certiorari in the case relied on by defendants. (*Broth. of Locomotive Eng.* v. *Burlington Northern* (9th Cir. 1988) 838 F.2d 1087, 1089, 1092, cert. granted and judgment vacated __ U.S. __ [106 L.Ed.2d 558, 109 S.Ct. 3207].) Nevertheless, it is obviously true that an employee is often subject to certain dress, cleanliness and health standards. Nothing prevents an employer from looking at the employee to see if he or she meets such standards. The employer can always observe its employees to see if they are performing the job properly and safely. If an employee appears to be under the influence of alcohol or drugs the employer can take appropriate action. Such sensory surveillance is nonintrusive because the employer is only observing what anyone can see. Accordingly, no privacy concerns are implicated in such public observations.

Defendants also point out that such observations have been held not to be searches in the criminal law context. (*People* v. *Snider* (1978) 76 Cal.App.3d 560, 565 [142 Cal.Rptr. 900].) However, this does not mean that a police officer can administer the test randomly. Grounds for detention must exist. If they exist, a policeman can shine a flashlight in a person's eyes and observe the reaction of the pupils. (*Ibid.*, quoting *People* v. *Benedict* (1969) 2 Cal.App.3d 400, 403-404 [82 Cal.Rptr. 759].) Even if the observations do not amount to a search, the *Snider* case recognizes that such observations do impinge on privacy to some extent. (*Id.*, at p. 566.)

From defendants' description, it appears that the pupillary reaction test used here is far less intrusive and burdensome than the blood, urine or breath tests which were approved in *Skinner* v. *Railway Labor Executives Ass'n, supra,* 489 U.S. 602 [103 L.Ed.2d 639, 109 S.Ct. 1402]. Nevertheless, the issue cannot be decided on demurrer. The complaint does not describe the test, and we cannot base a decision on defendants' description of the test.[7]

The trial court therefore erred in finding that "a pupillary eye test is a non-intrusive preliminary test that indicates the possible influence of drugs." Neither the trial court nor this court has any facts before it that would support such a conclusion. The only allegation in the complaint is that the purpose of the test is to determine if plaintiff was under the influence of drugs. The nature of the test, the equipment used, the manner

---

[7] At least one court has apparently ruled that a pupillary reaction test is not an accepted test for detecting cocaine usage under the Kelly-Frye (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C.Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145]) criteria. (*Cocaine—Detection Method Disallowed Under Kelly-Frye,* L.A. Daily Journal (Dec. 15, 1989) p. 3.)

of administration, its reliability, the handling of test results and similar concerns are all matters that enter into the weighing process. For example, defendants state that the purpose of the test was to provide individualized suspicion of drug use that would justify administration of a more intrusive drug test. Such a purpose would be relevant to the balancing process.

Secondly, defendants contend that even if a privacy interest is involved, the minimal intrusiveness on plaintiff's privacy is far outweighed by the employer's need to assure the efficient and safe operation of the workplace. (Lab. Code, § 6400 et seq.) Since Kerr-McGee operates a large chemical plant, its safety concerns are obvious and legitimate. However, there are no allegations in the complaint as to the type of work plaintiff was performing. As noted in footnote 6, *supra,* safety concerns may justify daily drug testing of an employee in charge of a chemical process but those same concerns would not be present if the employee was a gardener. The nature of the job therefore would enter into the balancing process.

Defendants rely on the recent Supreme Court cases of *O'Connor* v. *Ortega* (1987) 480 U.S. 709 [94 L.Ed.2d 714, 107 S.Ct. 1492] and *National Treasury Employees Union* v. *Von Raab, supra,* 489 U.S. 656 [103 L.Ed.2d 685, 109 S.Ct. 1384]. *O'Connor* discusses the reasonable expectation of privacy in an office in a search and seizure context, and *Von Raab* discusses a mandatory drug testing program for certain customs service employees. The latter case is particularly instructive because the drug-testing program there was limited to certain sensitive classes of employees, primarily those engaged in the drug war. The court there employed the balancing test in a Fourth Amendment context and found that the expectations of privacy do not outweigh the government's compelling interests in safety and in the integrity of our borders. (*Id.*, at p. 673 [103 L.Ed.2d at p. 706, 109 S.Ct. at p. 1394].)

While the employer's interests in the safe operation of its chemical plant may well outweigh the employee's expectations of privacy and justify random testing of certain groups of employees, the issue cannot be decided on demurrer.

## THE INDIVIDUAL CAUSES OF ACTION

Defendants next contend that all causes of action are barred or, if not barred, are individually defective. The trial court agreed with this contention and found that: "The entire complaint depends upon the concept of violation of the right of privacy and freedom from unreasonable search and seizure."

Since we have found that plaintiff can plead a tort cause of action for wrongful termination based upon the public policy exception to the at-will termination doctrine, defendants' contention that the other causes of action are barred must also fail. We therefore consider the remaining causes of action individually.

## A. *Contractual Causes of Action.*

■ As noted above, the presumption of at-will employment embodied in Labor Code section 2922 can be overcome by contractual as well as public policy allegations. In the second half of his first cause of action, and in the second and fifth causes of action, plaintiff attempts to assert express and implied contractual obligations. Such allegations have no place in the first cause of action, and will presumably be stricken on remand.

The second cause of action attempts to allege a contract cause of action for breach of an implied-in-fact promise to discharge for good cause only. Various oral representations are alleged in the fifth cause of action, and certain written allegations are included in the first and second causes of action.

Contract causes of action for breach of an implied-in-fact promise to discharge for good cause only are also discussed in *Foley*. The complaint there alleged that a course of conduct, including various oral representations, created a reasonable expectation that Mr. Foley would not be terminated except with good cause. The discussion of this cause of action in *Foley* reaffirms *Pugh* v. *See's Candies, Inc., supra,* 116 Cal.App.3d 311, and concludes that written employee handbooks, oral representations and the entire relationship of the parties may be examined to ascertain whether the plaintiff had a reasonable expectation that he would not be discharged except for good cause.[8] (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at pp. 675-682.)

While the statements quoted in the complaint do not say that an employee will not be discharged except for good cause, plaintiff should at least be given the opportunity to amend his second cause of action to allege all facts that support his cause of action for breach of an implied-in-fact contract. Leave to amend should have been given for the second and fifth causes of action.

---

[8] We agree with defendants that plaintiff will not prevail on these contractual causes of action if, as a result of the balancing test, defendants are found to have acted with good cause. As defendants put it, "once it is determined that Kerr-McGee's order did not require an invasion of a constitutional right, it follows that Petitioner was insubordinate, and thus that there was cause for his termination."

## B. *Fraud and Negligent Misrepresentation.*

The third cause of action is for fraud and the fourth cause of action is for negligent misrepresentation. ■■■ "The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 676, p. 778.)

Negligent misrepresentation occurs when a person makes false statements, honestly believing them to be true, but without a reasonable ground for his belief. (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 720, p. 819.)

■■■ "In the employment context, fraud claims frequently arise when employees allegedly are promised employment for as long as their service is satisfactory (or with a similar limit on termination) and the employee is terminated soon after hire." (Wrongful Employment Termination Practice, *supra*, § 2.55, pp. 60-61.) No such allegations are made in this case.

Here, these causes of action relate to three statements made in the employee handbook. The first statement defines a permanent full-time employee as a person who is expected to remain in the employ of the company indefinitely. The second statement refers to a policy of free and open communication and, specifically a problem-solving program based on communication. The third statement is that length of service is an important factor in many employee benefits and privileges.

We agree with defendants that these general statements in the employee handbook do not support a cause of action for fraud or misrepresentation. For example, the first amended complaint alleges that "[d]efendant did not allow plaintiff to meaningfully discuss or communicate the reasons for his refusal to take the drug test." Nothing in this allegation relates to the issue of termination for refusal to take the drug test. Since plaintiff's refusal was the basis for his termination, it is irrelevant whether he was allowed to discuss the reasons for his refusal.

Plaintiff clearly alleges that his complaint is based upon his discharge for refusal to take a drug test. The allegations of fraud and misrepresentation do not relate to this basic issue. Even if the quoted statements in the handbook are false, the allegations in the complaint do not show either an intent to defraud, reliance or damages, and there appears to be no possibility that the complaint can be amended to state a cause of action on these

grounds. (*Burton* v. *Security Pacific Nat. Bank* (1988) 197 Cal.App.3d 972, 980 [243 Cal.Rptr. 277].)

## C. *Tortious Breach of Contract.*

■ Plaintiff's sixth and ninth causes of action purport to be for tortious breach of contract and tortious inducement of breach of contract, respectively. They attempt to allege causes of action arising out of a tortious breach of the implied covenant of good faith and fair dealing.

In *Foley*, our Supreme Court held that tort remedies are not available for breach of the implied covenant in an employment contract. (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at pp. 682-700.) The court declined to consider whether its decision was retroactive, and plaintiff argues that it should not be applied retroactively. (*Id.*, at p. 700, fn. 43.)

However, our Supreme Court recently decided that *Foley* should be applied retroactively. (*Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973 [258 Cal.Rptr. 592, 772 P.2d 1059].) Accordingly, the demurrer to the sixth and ninth causes of action was properly sustained without leave to amend.

## D. *Emotional Distress and Loss of Consortium.*

■ In the seventh cause of action, plaintiff alleges that the actions of defendants intentionally caused him severe emotional distress and in his eighth cause of action he alleges negligent infliction of emotional distress. In the 10th cause of action his wife alleges a cause of action for loss of consortium.

■ The emotional distress tort is committed when defendant's conduct is intentionally intrusive and outrageous and has a severe and traumatic effect on the plaintiff's emotional tranquility. (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932 [160 Cal.Rptr. 141, 603 P.2d 58]; *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216].) Negligent infliction of emotional distress requires proof of the usual elements of negligence. (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 838, pp. 194-195.)

■ In *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 [233 Cal.Rptr. 308, 729 P.2d 743], the court held that, when disability results, a cause of action for intentional infliction of emotional distress is within the exclusive jurisdiction of the Workers' Compensation Appeals Board when it is based on conduct normally occurring in the workplace. The court discussed cases that previously considered the issue, including *Renteria* v. *County of Orange* (1978) 82 Cal.App.3d 833 [147 Cal.Rptr.

447]. In that case, the court held that an action for intentional infliction of emotional distress could be maintained against the employer when no physical injury or disability was alleged. In other cases, physical injury or disability was alleged, and workers' compensation was held to be the exclusive remedy.

Plaintiff contends that *Cole* is inapplicable because he did not allege a physical injury that would be compensable under the workers' compensation statutes. Defendants reply that all injuries stemming from termination fall under the exclusive remedy provisions of the workers' compensation statutes. Defendants cite *Pichon* v. *Pacific Gas & Electric Co.* (1989) 212 Cal.App.3d 488 [260 Cal.Rptr. 677], modified 212 Cal.App.3d 1369c, but in that case a workers' compensation settlement had been reached.[9]

This court has previously held that the proper test is whether the acts alleged were part of the normal employment relationship. (*Hart* v. *National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1429 [235 Cal.Rptr. 68].) We said: "[w]hen employers step out of their roles as such and commit acts which do not fall within the reasonably anticipated conditions of work, they may not then hide behind the shield of workers' compensation. This is as true today as it was before 1983." (*Id.*, at p. 1431.) Applying this test here, we find that the acts complained of were clearly a normal part of the work relationship, and the exclusive remedy provisions of the workers' compensation law apply. (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at pp. 160-161.)

Even if we found otherwise, we agree with defendants that plaintiff has not alleged any conduct that exceeds all bounds usually tolerated by a decent society. (*Agarwal* v. *Johnson, supra,* 25 Cal.3d 932; *Alcorn* v. *Anbro Engineering, Inc., supra,* 2 Cal.3d 493.) No program of supervisorial harassment is alleged here, and the dismissal for refusal to take the pupillary reaction test is not conduct "beyond all bounds of decency." (5 Witkin, Summary of Cal. Law, *supra,* Torts, § 404, pp. 484-485; Wrongful Employment Termination Practice, *supra,* § 2.52, pp. 57-59.) Even though the conduct here is not alleged to have caused disability or injury, the words of *Cole* are applicable: "If characterization of conduct normally occurring in the workplace as unfair or outrageous were sufficient to avoid the exclusive remedy provisions of the Labor Code, the exception would permit the employee to allege a cause of action in every case where he suffered mental disability merely by alleging an ulterior purpose of causing injury. Such an exception would be contrary to the compensation bargain and unfair to the

[9] A second case relied on by defendants has subsequently been ordered depublished. (*Giorgi* v. *Verdugo Hills Hospital* (Cal.App. B029050), ordered nonpub. Nov. 2, 1989.)

employer." (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 160.) We therefore find that plaintiff has failed to state a cause of action for intentional infliction of emotional distress.

Plaintiff has also failed to state a cause of action for negligent infliction of emotional distress. As noted above, this cause of action is simply one for negligence. Plaintiff alleges only that defendants had a duty to refrain from "conducting themselves with respect to plaintiff" because of the foreseeability of risk of harm to plaintiff's emotional health. It is clear, however, that there was no duty not to discharge defendants and that any actions by the employer were intentional, not negligent. "An employer's supervisory conduct is inherently 'intentional.'" (*Cole* v. *Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at p. 160.) The conduct alleged here does not support a cause of action for negligent infliction of emotional distress.

Since the causes of action for emotional distress were properly dismissed, Mrs. Semore's action for loss of consortium must fall also. In addition, since such a claim is based on physical injury or disability of the spouse, it is barred by the exclusive remedy provisions of the Labor Code. (43 Cal.3d at pp. 162-163.)

We therefore conclude that the trial court properly sustained the demurrer without leave to amend as to the seventh, eighth and tenth causes of action.

## DISPOSITION

The judgment of dismissal upon the sustaining of the demurrer without leave to amend is reversed as to the first, second, and fifth causes of action and affirmed as to the remaining causes of action.

Upon remand, the trial court shall enter its order giving plaintiff 30 days to file an amended complaint as to the first, second, and fifth causes of action.

Plaintiff to recover costs on appeal. (Cal. Rules of Court, rule 26(a).)

Dabney, J., concurred.

**McDANIEL, J.,** Concurring and Dissenting.—I concur in that portion of the majority opinion which affirms the sustaining of the demurrer as to the third, fourth, and sixth through tenth causes of action. I respectfully dissent from that portion of the majority opinion which reverses the sustaining of the demurrer as to the first, second, and fifth causes of action.

The majority opinion announces at the outset that "the right of privacy in the California Constitution protects Californians from actions of private employers as well as government agencies." From this pronouncement, the majority extrapolates the further proposition that "when a private employee is terminated for refusing to take a random drug test, he may invoke the public policy exception to the at-will termination doctrine to assert a violation of his constitutional right of privacy." There is no logical connection between these two propositions, and precedent militates against the latter.

Before turning to a refutation of the latter proposition above noted, it is worthy of observation that the majority has invoked *Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034 [264 Cal.Rptr. 194], in aid of the processes by which it reaches its underlying conclusion that the pupillary reaction eye test here involved could be an invasion of plaintiff's privacy. In that case, Wilkinson and her coplaintiffs sought an injunction against the Times Mirror Corporation to avoid having to submit to drug testing which they perceived to be an impermissible invasion of their privacy. While it is true that the *Wilkinson* court stated that the right to privacy could be infringed upon by a private employer, *the court went on to deny the plaintiffs' application for an injunction.* (*Id.*, at p. 1051.)

In *Wilkinson,* after an exhaustive discussion of the nature of the constitutional right to privacy secured by the California Constitution, the court then proceeded to determine that drug testing of prospective employees *is not an impermissible invasion of their constitutional right to privacy.* On this point, the court asked rhetorically, "[d]id Matthew Bender's request so substantially burden plaintiff's right of privacy that the request was constitutionally unreasonable and therefore impermissible?" The court's answer to its own question was, "We conclude not." (*Wilkinson* v. *Times Mirror Corp., supra,* 215 Cal.App.3d 1034, 1048.) Thus, it could persuasively be argued, had plaintiff here, rather than invite discharge, first sought an injunction to avoid submission to the pupillary reaction eye test, that he would, on the strength of *Wilkinson,* have failed to win such an injunction.

The *Wilkinson* holding is one of the reasons I have urged in seeking (unsuccessfully) to persuade my colleagues that this is not a right-to-privacy case, as such. I suggest that what has led the majority astray is the misapplication of a Fourth Amendment, criminal law concept to the private employment arena. In other words, even accepting for purposes of argument that the Fourth Amendment concept of a reasonable expectation of privacy can be invoked in private employment cases, this does not mean that the nature and extent of such expectation is necessarily the same in both criminal cases and private employment cases. The policy considerations that underlie the limiting of privacy intrusions which could lead to criminal

prosecution and incarceration are certainly more rigorous than those policy considerations which justify intrusions which meet the compelling need for a drug-free workplace.

Implicit in the *Wilkinson* holding, which held the intrusion into plaintiff's privacy to be permissible, is the distinction above delineated, namely that an individual's reasonable expectations of privacy in a civil employment setting must be far more circumscribed than those in a setting where the individual faces a possible criminal prosecution.

Thus, for the majority to conclude that the pupillary reaction eye test is an arguably impermissible invasion of privacy does not resolve the main issue presented by the pleadings; it is only the beginning. What needs to be decided here, even conceding that an invasion of privacy of sorts is present, is whether the refusal to submit to the test is or is not a legally acceptable reason for discharge.

In my view, precedent provides an exact and ready answer to the real issue in the case before us. More particularly, under *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373], plaintiff cannot state a cause of action for wrongful discharge on the theory of a perceived impermissible invasion of his privacy, because, under the *Foley* test, plaintiff's assertion of his *private* right to be free from drug testing does not serve the *public* interest.

In *Foley*, the Supreme Court established two tests for determining whether a discharge was against public policy, and hence tortious. The first test was whether the discharge "affects a duty which inures to the benefit of the public at large rather than to a particular employee" (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d 654, 669); the second test was whether the "interest at stake was . . . one which could not properly be circumvented by agreement of the parties." (*Id.*, at p. 670, fn. 12.) According to *Foley*, only if *both questions* could be answered in the affirmative, would the alleged policy be truly "public."

When the Supreme Court posed the foregoing questions in relation to the duty alleged by Foley, both answers were negative. More specifically, the court concluded that an employee's duty to disclose to his employer adverse information about a fellow employee served only the private interest of the employer, and that an express agreement between the parties that the employee should not disclose such information would not be contrary to public policy.

In reaching this conclusion, the court reasoned that "[p]ast decisions recognizing a tort action for discharge in violation of public policy seek to

protect the public, by protecting the employee who refuses to commit a crime (*Tameny* [v. *Atlantic Richfield Co.* (1980)] 27 Cal.3d 167; *Petermann,* [v. *International Brotherhood of Teamsters* (1959)] 174 Cal.App.2d 184), who reports criminal activity to proper authorities (*Garibaldi* v. *Lucky Food Stores, Inc.* (9th Cir. 1984) 726 F.2d 1367, 1374; *Palmateer* v. *International Harvester Co.* [(Ill. 1981)] *421 N.E.2d 876, 879-880), or who discloses other illegal, unethical, or unsafe practices (Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015] [working conditions hazardous to employees]). No equivalent public interest bars the discharge of the present plaintiff." (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 670-671.)

So it is here. Although the public policy in *Foley* was alleged in terms of a duty and the public policy here is alleged in terms of a right, the dispositive questions are the same. In other words, we must ask whether plaintiff's discharge affects a right which, when exercised, inures to the benefit of the public at large rather than to the plaintiff alone, and whether an express agreement between defendant and plaintiff which obligated plaintiff to waive that right would be void as against public policy. *Clearly the answer to both questions is negative.* More specifically, plaintiff's right not to participate in the pupillary reaction test benefits him alone, and a contract provision obligating him to participate in such a test would not be invalid. Because, to repeat, "a tort action for discharge in violation of public policy seek[s] to protect the *public"* (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 670, italics added), plaintiff cannot plead such an action to protect himself, and defendant's demurrer thereto was properly sustained without leave to amend.

The majority, in holding that plaintiff may be able to plead an action for discharge in violation of public policy, pays lip service to *Foley,* but does not faithfully track *Foley*'s analysis. Instead, the majority bases its holding on four reasons, here addressed in turn.

First, the majority asserts that "privacy . . . is at least as fundamental as the antitrust statutes in *Tameny* or the perjury statutes in *Petermann"* (see maj. opn., *ante,* p. 1096). In other words, apparently, the right of the plaintiff in this case to refuse to take the eye test is at least as fundamental as the right of the plaintiff in *Tameny* to refuse to engage in price-fixing or the right of the plaintiff in *Petermann* to refuse to testify falsely to a state legislative committee, rights which the *Foley* court held were entitled to protection. However, the *Foley* issue is not whether the right is *fundamental,* but whether it "protect[s] the public." (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 670, italics added.) Refusing to engage in price-fixing and refusing to testify falsely before a state legislative committee both

protect the public;[1] refusing to participate in a pupillary reaction test does not.[2] Accordingly, the former are covered by the public policy rule in *Foley*; the latter is not.

Next, the majority states that plaintiff's right not to participate in the eye test "is a right he shares with all other employees," and that his assertion of the right "benefits all Californians." However, unlike the plaintiffs in *Wilkinson,* plaintiff here did not file an action on behalf of all others similarly situated, nor did he seek declaratory or injunctive relief. Accordingly, if plaintiff's assertion of his right not to be discharged "benefits all Californians," it does so only in a very limited, indirect sense, if at all, and certainly does not do so in the sense contemplated by *Foley*.[3]

Next, the majority argues, although defendant and plaintiff could agree that plaintiff would not assert his right to privacy (presumably, in connection with the eye test), that defendant and plaintiff could not agree that defendant could "visit [plaintiff's] home at midnight each night to search for drugs." To what avail? I fail to see how the second agreement follows from the first. This amounts to arguing that A and B can agree that A will lend B money, but A and B cannot agree that A can collect the money at gunpoint. Because the second agreement does not follow necessarily or logically from the first, it does not invalidate it either.

Finally, the majority asserts that "the dispute here is more than a dispute between Mr. Semore and Kerr-McGee. It is a dispute over the role of drug testing in the workplace." While this may be true in an underlying sense, it is irrelevant to the issue here and an issue not even remotely raised by the pleadings. Such characterization is irrelevant because *all actions for wrongful discharge* involve disputes over the propriety of particular conduct in the workplace. However, under *Foley*, it is only when the conduct which led to the discharge benefits the public at large rather than a particular employer or employee that the discharge is in violation of public policy. Otherwise,

---

[1] Price-fixing, or violation of the Sherman Antitrust Act (15 U.S.C. § 1 et seq.) and the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.), by definition involves the public; perjury (Pen. Code, § 118) is included in title 7 of the Penal Code, which is entitled "OF CRIMES AGAINST PUBLIC JUSTICE." (underscoring added.)

[2] Actually, it could reasonably be argued that employees who refuse to participate in drug testing do so in *derogation* of the public interest, and employees who consent to such testing do so in protection of the public weal.

[3] At oral argument, it was significant to me that plaintiff's attorney, when asked whether the right which plaintiff was asserting inured to his benefit or to the benefit of the public, answered that it inured to plaintiff's benefit and "later" to the benefit of the public. The attorney also conceded that this was not a "traditional" *Foley* case, i.e., did not involve the type of right recognized by *Foley* and its predecessors as coming under the public policy rule, and that the "main focus" of this case was plaintiff's contract claim, and not his tort (wrongful discharge) claim.

every employee who alleged that he or she had been wrongfully discharged could allege that the discharge had been in violation of public policy, thus rendering meaningless the guidelines promulgated in *Foley* for such a cause of action.

In sum, while the majority's somewhat heroic concept that the plaintiff here, by asserting his own right to privacy, is fulfilling a role similar to that of the Spartan defenders of the pass against the Persians at the Battle of Thermopylae (480 B.C.E.) could perhaps have proved beguiling as an a priori proposition, the legal reality is that *Foley* has already occupied the field. *Foley* has ruled that employment termination cases are not to be decided on the basis of heroics, but rather on the basis of a determination of whether the plaintiff's insubordinate conduct has been pursued in the *public* or *private* interest. Under the *Foley* guidelines by which such a determination is to be made, this is not even a close case.

Moreover, because the wrongful termination issue is precisely subject to the control of and disposition by *Foley*, it is appropriate to invoke *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937]. In *Auto Equity Sales,* the Supreme Court said, "[u]nder the doctrine of *stare decisis,* all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction . . . . The decisions of this court are binding upon and must be followed by all the state courts of California." (*Id.*, at p. 455.) Accordingly, because *Foley* is wholly dispositive of the wrongful termination issue, as presented in count one of the complaint, this court is duty bound under *Auto Equity Sales* to follow and apply *Foley*.

In reliance on the foregoing analysis, I would sustain the demurrer as to plaintiffs' first cause of action for wrongful discharge in violation of public policy. As to plaintiffs' second and fifth causes of action, for, respectively, termination without good cause and breach of contract, my conclusion that the discharge was not in violation of public policy would invalidate the sufficiency of those counts as well. (See maj. opn., fn. 8.) Accordingly, I would affirm the trial court's judgment of dismissal in its entirety.

Respondents' petition for review by the Supreme Court was denied May 31, 1990.